UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SAEED PIROOZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.:    4:05MC00521 CDP |
| | ) | |
| MEMC ELECTRONIC MATERIALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

_____

**DEFENDANT MEMC ELECTRONIC MATERIALS, INC'S
MEMORANDUM IN SUPPORT OF
MOTION TO VACATE ARBITRATION AWARD**

_____

**Table of Contents**

Page

I.    Introduction...................................................................................1

II.   Factual Background ......................................................................3

      A.    Employment History .......................................................3

      B.    Termination and Severance Payment Conditions...........5

      C.    Soitec and MEMC Are Competitors................................7

      D.    MEMC's Response upon Learning of Pirooz's Employment ........9

      E.    Arbitrator's Decision ................................................. 10

III.  Applicable Law............................................................................. 12

IV.   Argument ..................................................................................... 14

      A.    Award Based On Equitable Grounds Constitutes
            Manifest Disregard of Law and Exceeds Arbitrator's
            Powers Granted In Severance Agreement .................................... 14

      B.    Failure to Enforce Severance Agreement Despite
            Finding of Competition in SOI Market........................................23

      C.    Failure to Address and Enforce "Similar To" Limitation.............26

      D.    Award of Attorneys Fees Constitutes Manifest
            Disregard Of Law and Exceeds Powers Granted by
            Severance Agreement .................................................28

V.    Conclusion ........................................................................... 32

COMES NOW Defendant, MEMC Electronic Materials, Inc. ("MEMC"), by and through counsel, Sauter Sullivan, LLC, and for its Memorandum in Support of Motion to Vacate Arbitration Award, states as follows:

## I. INTRODUCTION

Effective June 30, 2002, Plaintiff Saeed Pirooz's ("Pirooz") employment relationship with MEMC was terminated, at which time the parties negotiated an agreement which provided that MEMC would give Pirooz a package of severance benefits (including stock vesting rights, cash compensation, health insurance, etc.) in exchange for which Pirooz basically agreed not to go work for another company that made or sold products "competitive with or similar to" MEMC products for a period of 2 years.  The parties further agreed that if Pirooz breached this obligation and went to work for another company that made or sold products "competitive with or similar to" MEMC products, Pirooz would forfeit or give back the severance benefits.   After receiving cash and severance benefits worth over $300,000, Pirooz, in fact, went to work for a company that sold the same (as opposed to simply similar) products as products sold by MEMC and, he failed and refused to give back the severance benefits.  Thus, MEMC brought an arbitration action against Pirooz for breach of contract and sought as relief return or forfeiture of the severance benefits it had paid to Pirooz.

MEMC seeks review by this Court of the July 8, 2005 arbitration decision and award against MEMC in favor of Plaintiff on a breach of contract claim brought by Defendant against the Plaintiff.  Despite the clear agreement between the parties, the arbitrator elected not to "enforce" the agreement between the parties and require Pirooz to forfeit the benefits, because, in the arbitrator's opinion, doing so would be "unfair and inequitable" to Pirooz.  The arbitration award must be vacated pursuant to 9 U.S.C. Section 10(4) because the arbitrator exceeded the

1

powers granted to him under the agreement between the parties that formed the basis for the arbitration by: (i) applying equitable principles to decide this contract action and, thus, disregarding applicable Missouri law, (ii) failing to enforce the agreement between the parties, and (iii) awarding attorneys' fees without authority under either the agreement or Missouri law. The arbitration award should also be vacated by this Court because the arbitration decision is completely irrational and because the basic premise of the award (i.e., it would be unfair and inequitable to enforce what the parties agreed to) evidences a manifest disregard for Missouri law.

2

## II.  FACTUAL BACKGROUND

MEMC Electronic Materials, Inc. is a Delaware corporation in good standing which maintains its principal place of business in St. Peters, Missouri.  MEMC is a leading manufacturer and supplier of silicon wafers which are used to make semiconductors.  MEMC does business worldwide.  Copies of MEMC's 2001 through 2004 Annual Reports are attached hereto as **Exhibits 1 - 4** respectively.[1]  Semiconductors are essential components of computers, consumer electronics, industrial electronics, and various other applications.  As a technology company, MEMC's ability to exist as a successful business relies to a substantial extent on the protection of certain confidential and proprietary information.  As a result, MEMC requires employees who have access to said confidential and proprietary information to sign agreements in which they agree to protect the company's information and not to work for certain entities for a certain period of time after the termination of their employment from MEMC.  The entities which employees are prohibited from working for are limited to companies which produce products which are competitive with or similar to products produced by MEMC.

A.    Employment History.

Saeed Pirooz (hereinafter "Pirooz") became an employee of MEMC on July 1, 1990. Over the years, Pirooz worked his way up the corporate ladder at MEMC.  A copy of a Job History of Pirooz at MEMC is attached hereto as **Exhibit 5**.  On June 1, 2000, Pirooz was promoted to the position of Strategic Business Director.  As a result of the access to confidential and proprietary information that Pirooz was to have in his new position, MEMC required that Pirooz sign a Confidentiality Agreement.  A copy of the Confidentiality Agreement signed by

---

[1] All of the Exhibits referenced in this brief were exhibits which were introduced into evidence at the arbitration hearing, with the exceptions of Exhibits 42, 43, 44 and 45 which are copies of the briefs and other submissions to the arbitrator and Exhibit 46 which is a copy of the arbitrator's

3

Pirooz is attached hereto as **Exhibit 6**.  The section of the Confidentiality Agreement signed by Pirooz entitled "COMPETITIVE ACTIVITY," states in relevant part,

> "I shall not, directly or indirectly (whether as owner, partner, consultant, employee or
>
> otherwise), at any time during the period of two years following termination for any reason
>
> of my final employment with MEMC, engage in or contribute my knowledge to any work or
>
> activity that involves a product, process, apparatus, service or development which is then
>
> competitive with or similar to a product, process, apparatus, service or development on
>
> which I worked or with respect to which I had access to Confidential Information while at
>
> MEMC Electronic Materials, Inc. or any Affiliate at any time during the period of five years
>
> immediately prior to such termination ("Competitive Work")."

On February 1, 2002 Pirooz was again promoted, this time to the position of Vice President of Corporate Technology.  In conjunction with his move to this new position, Pirooz and MEMC entered into an Employment Agreement.  A copy of the Employment Agreement is attached hereto as **Exhibit 7**.  The Employment Agreement established Pirooz's salary and access to benefits.  Also, in Paragraph 5 of the Employment Agreement, Pirooz reaffirmed his obligations under the Confidentiality Agreement, including specific mention of his obligations under the "Competitive Activity" section.

The Employment Agreement further established terms for termination of Pirooz's employment.  It permitted MEMC to terminate Pirooz's employment with or without cause without paying Pirooz any termination benefits under certain circumstances.  The Employment Agreement also permitted Pirooz to terminate his employment for "good reason," as defined and, in such case, Pirooz would be entitled to certain termination benefits payable by MEMC as

award.

4

provided in Section 4(f)(i) of the Employment Agreement if Pirooz executed a general release

and waiver.  If Pirooz terminated his employment without "good reason," as defined, the

Employment Agreement provided that no termination benefits would be payable.

      B.     <u>Termination and Severance Payment Conditions</u>.

On July 30, 2002, MEMC notified Pirooz that, in accordance with the Employment

Agreement, MEMC was electing to terminate his employment.  A copy of the termination letter

is attached hereto as **Exhibit 8**.  The letter went on to state that if Pirooz executed a general

release and waiver for MEMC, he would be provided with a continuation of his salary for a one

year period, as well as other benefits.

After negotiations between the parties about Pirooz's departure, Pirooz and MEMC

ultimately entered into a General Release and Waiver Agreement (hereinafter "Severance

Agreement") on August 20, 2002.  To allow Pirooz maximum flexibility in future job searches,

the Severance Agreement provides that Pirooz voluntarily terminated his employment with

MEMC effective July 30, 2002.  A copy of the Severance Agreement is attached hereto as

**Exhibit 9**.  The terms of the Severance Agreement stated that Pirooz was to receive "in

consideration and recognition of past services rendered and in exchange for Dr. Pirooz's

promises and obligations herein . . ." $135,000.00 in cash, continued coverage under MEMC's

medical and dental plans for a specified period of time, a six-month professional outplacement

program, continued vesting in MEMC's stock option plan, continued ability to exercise

outstanding stock options granted to Pirooz for a period of 60 days, and a letter of reference.

The sum total of these payments and benefits exceeded $300,000.00.  MEMC provided all of its

consideration and satisfied all of its obligations under the Severance Agreement to Pirooz in

order to ensure protection of MEMC's confidential information and technical know-how from competitors.

The Severance Agreement also stated in Paragraph 8 that Pirooz agreed, as part of the consideration he was to provide MEMC under the Severance Agreement, that he had continuing obligations to MEMC pursuant to the Confidentiality Agreement that was signed by Pirooz on September 15, 2000, and pursuant to Section 5 of the February 1, 2002 Employment Agreement, which incorporated by reference the Confidentiality Agreement.  Thus, at the time Pirooz left MEMC and accepted all the severance benefits, he expressly agreed that he would be bound by the above-quoted provision of the Confidentiality Agreement.  Therefore, he was essentially agreeing that for a two year period of time after July 30, 2002, he would not work for a company that had a product "competitive with or similar to" an MEMC product.  In exchange for this promise of forbearance, Pirooz was paid the severance benefits.  Importantly, the parties further agreed in Paragraph 8 of the Severance Agreement that "any violation" by Pirooz of this obligation or promise would be a "material breach" of the Severance Agreement entitling MEMC to return of the severance payments and benefits to Pirooz.  Therefore, Pirooz expressly agreed that if he went to work during the proscribed two year period of time for another company that sold products "competitive with or similar to" MEMC products, he would return the package of over $300,000 of severance benefits.

As part of the arbitration, MEMC discovered the following details of the employment discussions between Soitec and Pirooz.  In January 2003, Pirooz emailed his resume to Soitec USA, Inc. (hereinafter "Soitec") to apply for the open position of National Director of Sales.[2]  A

---

[2] In the course of the arbitration, MEMC discovered that Pirooz did not ask MEMC for relief from the Confidentiality Agreement in advance, as the Confidentiality Agreement dictated he should.

copy of Pirooz's email to Soitec with resume is attached hereto as **Exhibit 10** and a copy of the

Job Description for Soitec's National Director of Sales position is attached hereto as **Exhibit 11**.

On September 2, 2003, Soitec offered, and shortly thereafter, Pirooz accepted, the position of

Soitec's National Sales Director.  A copy of the letter from Soitec offering the position to Pirooz

is attached hereto as **Exhibit 12**.  On November 24, 2003, Soitec issued a press release

announcing the hiring of Pirooz.  A copy of this press release is attached hereto as **Exhibit 13**.

      C.    <u>Soitec and MEMC Are Competitors.</u>

      Soitec is a French corporation with its headquarters located in Bernin, France.  Soitec is

also a manufacturer and supplier of silicon wafers which are used in the production of

semiconductors.  Copies of Soitec's 2000-2001 through 2003-2004 Annual Reports are attached

hereto as **Exhibits 14 - 17** respectively.

      Soitec manufactures silicon-on-insulator ("SOI") wafers, which is a type of silicon wafer

used by semiconductor device makers such as IBM and AMD.  For several years prior to

Pirooz's termination of employment on July 30, 2002, MEMC was involved in the sale and

manufacture of SOI wafers, as well as the manufacture and sale of epitaxial, or EPI, wafers and

polished wafers.  From 2001 through 2004, MEMC participated in a Technology Cooperation

Agreement and Sales Representative Agreement with Ibis Technology Corporation (hereinafter

"Ibis") in which MEMC participated, through these agreements, in the sale of SOI wafers which

competed directly in the silicon wafer market for the same customers as Soitec with the SOI

wafers produced by Soitec.  A copy of the Sales Representative Agreement dated April 1, 2001

between MEMC and Ibis is attached hereto as **Exhibit 18**.  A copy of a statement of MEMC's

royalty income from the sale by MEMC of SOI wafers is attached hereto as **Exhibit 19**.

In addition, MEMC had been working for years on either producing its own SOI wafers or partnering with additional SOI companies.  Pirooz, while employed at MEMC, was not only aware of, but also participated in MEMC's efforts to grow its SOI business beyond MEMC's existing relationships.  Pirooz was a significant player in MEMC's efforts to broaden its SOI capabilities such that he participated in numerous discussions internally at MEMC on the subject.  Copies of email discussions that included Pirooz regarding SOI technology are attached hereto as **Exhibits 20, 21,  22 & 23**.  He authored a report entitled "MEMC: SOITEC – Bernin" in which Pirooz discussed the possibility of a joint venture between Soitec and MEMC or a proposed straight buyout of Soitec by MEMC.  A copy of the report authored by Pirooz entitled "MEMC: SOITEC – Bernin" is attached hereto as **Exhibit 24**.  Pirooz also authored a document entitled "MEMC: SOI Business Plan" dated July 2002 in which he analyzed MEMC's options for further penetration into the SOI market over MEMC's already existing relationships.  A copy of the report authored by Pirooz entitled "MEMC: SOI Business Plan" is attached hereto as **Exhibit 25**.

More importantly, despite the differences between Soitec's wafers and MEMC's wafers, both companies have competed for wafer sales with some of the very same purchasers.  During his time at MEMC, Pirooz also authored documents entitled "Technology Monthly Report," "Materials Research & Characterization Executive Summary," and "Materials Research and Characterization - Monthly Highlights."  Copies of said documents are attached hereto as **Exhibits 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36 & 37**.  In these reports, <u>Pirooz himself indicated</u> that MEMC was competing with Soitec for sales of MEMC's SOI silicon wafers to buyers such as Intel and AMD.  In fact, in recent years Soitec has replaced MEMC as the wafer

supplier for microprocessors to AMD, Freescale and IBM.  Further, before Pirooz joined Soitec,

AMD replaced MEMC's wafers with Soitec wafers in AMD's microprocessor business.

Even Soitec, in its own internal literature, considers MEMC to be a competitor.  In the

materials for Soitec's world wide sales meeting which was held July 8 to July 11, 2004, there are

multiple mentions of MEMC as a competitor of Soitec.  A copy of said meeting materials is

attached hereto as **Exhibit 38**.  Lastly, and most importantly, the arbitrator implicitly

acknowledged that MEMC and Soitec compete, when he found that MEMC sold SOI wafers in

conjunction with the Ibis relationship. [Ex. 46; P. 7]

      D.     <u>MEMC's Response Upon Learning of Pirooz's Employment.</u>

Upon learning of Pirooz's employment with Soitec, on November 14, 2003 MEMC sent

Pirooz a letter asserting that Pirooz had breached his obligations under the Confidentiality

Agreement and the Severance Agreement.  A copy of this letter is attached hereto as **Exhibit 39**.

The November 14th letter requested return of the severance payment made to Pirooz.  Counsel

for Pirooz responded to this correspondence with a letter dated November 20, 2003.  This letter

communicated Pirooz's refusal to return the severance payment as required by the Severance

Agreement, <u>and after the fact</u> requested release of Pirooz from his non-compete obligations.  A

copy of this letter is attached hereto as **Exhibit 40**.  As such, Pirooz breached the Severance

Agreement.

Because the Severance Agreement contains an arbitration provision, MEMC filed a

Demand for Arbitration with the American Arbitration Association on June 1, 2004.  A copy of

the Demand for Arbitration is attached hereto as **Exhibit 41**.  The claim brought by MEMC was

a basic breach of contract claim seeking damages in the amount of the severance payments made

to, or on behalf of, Pirooz under the Severance Agreement.  There were no equitable claims or

9

relief sought by MEMC.  The specific contract provision breached by Pirooz was Paragraph 8 of

the Severance Agreement which provided that "any" failure of Pirooz to comply with the non-

compete obligations under the Confidentiality Agreement would be a "material breach" of the

Severance Agreement.  MEMC asserted that Pirooz breached the non-compete obligation he had

reaffirmed in the Severance Agreement --and had pocketed over $300,000 because he had agreed

to be bound by such a provision--by going to work for Soitec because Soitec manufactured and

sold products that were "competitive with or similar to" products manufactured and sold by

MEMC.

       E.     <u>Arbitrator's Decision.</u>

On May 3rd, 4th and 5th of 2004 an arbitration hearing was held by arbitrator John

Gianoulakis.  Prior to the arbitration, both parties submitted arbitration briefs.  Copies of

MEMC's and Pirooz's arbitration briefs are attached hereto as **Exhibits 42 & 43** respectively.

At the hearing, testimony was taken from Dr. Greg Wilson, Tom Goins, David Fleisher and

Pirooz on behalf of MEMC and from Pirooz and Dr. John Paul DeLuca on behalf of Pirooz.

Sixty exhibits were submitted on behalf of MEMC and thirty-two exhibits were entered by

Pirooz.  No transcript was made of the testimony at this arbitration hearing.  After the arbitration,

both parties submitted post-arbitration briefs for consideration by the arbitrator.  Copies of

MEMC's and Pirooz's post-arbitration briefs are attached hereto as **Exhibits 44 & 45**

respectively.

On July 8, 2005, Arbitrator Gianoulakis entered an award.  A copy of the award is

attached hereto as **Exhibit 46**.  Arbitrator Gianoulakis denied MEMC's claims in their entirety,

awarded attorneys fees in the amount of $106,832.69 to Pirooz, and ordered that the expenses of

the arbitration in the amount of $19,299.00 be borne entirely by MEMC.  The decision was not

based on the contract, but rather on a belief by the arbitrator that it would be "unfair and inequitable" to Pirooz to enforce the contract to which the parties had agreed.

On August 29, 2005, Pirooz filed a Complaint for Confirmation of Arbitration Award and Entry of Judgment.  MEMC now files its Motion to Vacate Arbitration Award and Motion to Stay Confirmation of Arbitration Award.

### III.  <u>APPLICABLE LAW</u>

Dr. Pirooz's Complaint to confirm the arbitration award is brought pursuant to the Federal Arbitration Act.  9 U.S.C. Section 1 <u>et</u> <u>seq.</u> Under Section 10 of the Federal Arbitration Act, this Court may make an order vacating the arbitration award under certain circumstances.  Specifically, subsection (4) provides authority for the Court to set aside the award, "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  In addition to the grounds provided by the Federal Arbitration Act, an arbitration award should be set aside where it is completely irrational or evidences a manifest disregard for the law.  *Hoffman v. Cargill, Inc.*, 236 F.3d 458, 461 (8th Cir. 2001); *Kiernan v. Piper Jaffray Companies, Inc.*, 137 F.3d 588, 594 (8th Cir. 1998).  An arbitration award is in manifest disregard for the law where the arbitrator clearly identifies the applicable, governing law and then proceeds to ignore it.  *Hoffman* at 462.

There is generally no right to appeal of an arbitration award.  As such, careful review by the District Court is extremely critical because it is essentially the only relief available from an arbitration decision which involves clear error by an arbitrator.

Although deference is to be given to an arbitrator's award under the Federal Arbitration Act, this deferential standard of review does not grant unlimited power to the arbitrator to ignore applicable law, disregard the agreement of the parties or impose obligations on the parties beyond the agreement of the parties.  An arbitrator's authority is not only derived from the agreement of the parties, but it is also limited by the agreement of the parties.  *Harry Hoffman Printing, Inc. v. Graphic Communications International Union, Local 261*, 950 F.2d 95, 98 (2nd Cir. 1991).  The arbitrator is not free to dispense his own brand of justice.  *Id.*  Where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end.  *Delta Queen*

12

*Steamboat Co. v. District 2 Marine Engineers Beneficial Association*, 889 F.2d 599, 603 (5th Cir.

1989).

## IV.  ARGUMENT

A.  Award Based On Equitable Grounds Constitutes Manifest Disregard Of Law And Exceeds Arbitrator's Powers Granted in Severance Agreement.

Arbitration is a matter of contract and consent.  *Teamsters Local Union No. 688 v. Electrical Wire Products, Inc.*, 186 F.3d 878, 881 (8th Cir. 1999).  The arbitrator is confined to interpretation and application of the Severance Agreement.  *United States Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597 (U.S. 1960).  The arbitrator has no authority to ignore the plain language of the Severance Agreement when the Severance Agreement states limitations to the scope of his authority. *Hawaii Teamsters and Allied Workers Union, Local 996 v. United Parcel Service*, 241 F.3d 1177, 1181 (9th Cir. 2001).   The arbitrator must construe the contract; he cannot amend it.  *Alvey, Inc. v. Teamsters Local Union No. 688*, 132 F.3d 1209, 1213 (8th Cir. 1997).  When an arbitrator fails to fulfill his contractual obligations and, therefore, the award does not draw its essence from the agreement, courts refuse to enforce the arbitrator's award.  *Trailways Lines, Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416, 1421 (8th Cir. 1986).

As set forth above, the only claim to be decided in the arbitration was a simple breach of contract claim brought by MEMC against Pirooz.  The claim involved a breach by Pirooz of a single provision incorporated as an obligation of Pirooz under the August 20, 2002 Severance Agreement the parties entered into at the time of Pirooz's termination.  There were no claims made by Pirooz against MEMC and no equitable claims or remedies sought by MEMC.  Rather, MEMC sought damages for Pirooz's breach of his promise made in the Severance Agreement when the parties parted ways (and Pirooz gladly accepted the severance benefits of over $300,000.00) that he would abide by all the obligations to MEMC pursuant to Section 5 of the

14

Employment Agreement and to his continuing obligations under the Confidentiality Agreement. [Ex. 9; P. 4].  In the Severance Agreement, the parties essentially agreed that MEMC would provide Pirooz with certain severance payments and benefits (worth over $300,000.00) and, in exchange, Pirooz reaffirmed his commitment to comply with specific non-competition and confidentiality obligations he had agreed to earlier in his employment relationship. [Ex. 9]

In the Severance Agreement between the parties, which is the sole basis for MEMC's claim and which the arbitrator was charged with interpreting and enforcing, the parties even specifically agreed in August 2002 that "(a)ny violation of [the non-compete and confidentiality] obligations by Dr. Pirooz constitutes a material breach of this Agreement and subjects Dr. Pirooz to forfeiture of all benefits and payments pursuant to this Agreement." [Ex. 9; P. 4].  Thus, there was no need for the arbitrator to even consider whether a failure to comply with the non-compete and confidentiality obligations is a "material" breach of the Severance Agreement, because the parties had already agreed that any such failure would constitute a material breach.  Moreover, the amount of damages for breach was even set by the parties up front (i.e., the amount of damages is simply the value of the severance benefits Dr. Pirooz received) such that the arbitrator did not even need to evaluate the proper measure of damages. [Ex. 9; P. 4]

As discussed above, the sole basis for MEMC's claim involving breach of paragraph 8 of the Severance Agreement is Dr. Pirooz's failure to comply with his promise to not "directly or indirectly (whether as owner, partner, consultant, employee or otherwise), at any time during the period of two years following termination for any reason of my final employment with MEMC, engage in or contribute my knowledge to any work or activity that involves a product, process, apparatus, service or development which is then competitive with or similar to a product, process, apparatus, service or development on which I worked or with respect to which I had

15

access to Confidential Information while at MEMC Electronic Materials, Inc. or any Affiliate at any time during the period of five years immediately prior to such termination." [Ex. 6; P. 2]. The arbitrator's job in this case was simply to interpret the plain language of this provision and make a determination whether Dr. Pirooz breached his obligations under this provision.  In other words, "did Pirooz comply with his obligations under this non-compete provision?"

A review of the arbitration award and opinion demonstrates that the arbitrator in this case went well beyond his narrow job of determining breach or no breach of this basic provision. [Ex. 46].  Instead, he looked at the conduct of the parties and evaluated the fairness and appropriateness of the termination of Dr. Pirooz. [Ex. 46].  For example, the arbitrator looked at whether Dr. Pirooz was terminated for "just cause" or for "good reason" and the other facts and circumstances of Dr. Pirooz's termination.[3] [Ex. 46].  The arbitrator then applied equitable principles and imposed equitable and other requirements and terms on the parties which are not contained within the non-compete and confidentiality provision he was to interpret. [Ex. 46].  As such, he went beyond the Severance Agreement which the parties agreed to, and which he was charged with enforcing.  In short, there is nothing in the language of the Severance Agreement which the arbitrator was interpreting and enforcing which would provide a basis for him to conclude that he had the authority to apply or consider equitable principles as opposed to basic Missouri contract interpretation principles.

---

[3] These facts were totally irrelevant to the single issue to be determined by the arbitrator. Indeed, the purpose of the Severance Agreement was to put to rest all the issues associated with the termination of Dr. Pirooz and come to an agreement on the terms under which the parties would part ways. Those terms had, fundamentally, one simple quid pro quo feature: MEMC would pay Pirooz a considerable amount of money (over $300,000) to protect MEMC's confidential information, and Pirooz would not violate his confidentiality and non-compete obligations. When this quid pro quo failed, because Pirooz <u>did</u> violate his confidentiality and non-competition obligations, MEMC demanded arbitration to get the benefit of its bargain.

16

Early on in his decision, the arbitrator correctly recognized that this is an action for damages by MEMC "for the alleged breach of contract" by Pirooz. [Ex. 46; P. 2].  Nonetheless, even a cursory review of the decision demonstrates that the arbitrator incorrectly considered this an equitable matter and made his decision on equitable grounds, as opposed to applying appropriate Missouri contract law to decide what he clearly admitted was a breach of contract action.  For example, on page 3 of the decision, immediately after stating that MEMC's claims would be denied, the arbitrator quoted cases which state the legal axiom that "(e)quity abhors forfeitures and they are not favored by law." [Ex. 46; P. 3].  He further stated in the next line of his award that "(f)orfeitures are to be prevented when it is 'inequitable to allow a forfeiture to be enforced'." [Ex. 46; P. 3]

The remainder of the award clearly illustrates that the arbitrator based his decision on, or gave significant weight to, what he felt was the inequitable nature of Pirooz's termination without "just cause," even though the Severance Agreement states that Pirooz left voluntarily.  In the last paragraph of page 3 of the decision, the arbitrator stated:

"[MEMC] and [Pirooz] entered into a three year employment agreement dated February 1, 2002. [Pirooz] and his family were living in California at the time this three year contract was entered into.  In June and July 2002, [Pirooz] was one of six executive officers of [MEMC], and he was serving as Vice President and Chief Technology Officer of [MEMC].  About June 30, 2002, [Pirooz]'s family (his wife and children) completed their move back to St. Louis from California where [Pirooz] had been working as the MEMC account manager for Intel.  Respondent was terminated *without cause* one month later on July 30, 2002.  See [Pirooz]'s Exhibit 1 (also labeled Exhibit 42).[2]" {emphasis added} [Ex. 46; P. 3]

Later in the decision, the arbitrator devoted more than a page to discussing ways in which he felt Pirooz's termination cost him benefits he would have otherwise been able to receive. [Ex. 46; P. 7 & 8].  Finally, the arbitrator concluded his argument and made his ruling by stating:

"Under all the circumstances brought out in the hearing, it would be *unfair and inequitable* to enforce this forfeiture as either a legal or equitable remedy.  See <u>Seebree v. Rosen</u> and <u>Hawkins v. Foster</u>, <u>supra.</u>, p. 3." {emphasis added}[4] [Ex. 46; P. 8]

This statement, along with the other references discussed above, amply demonstrate that the arbitrator based his decision and award on equitable principles and considerations of whether Dr. Pirooz was terminated with or without cause (even though the Severance Agreement provided that Pirooz left voluntarily) rather than applying basic Missouri contract interpretation principles to the facts and determining whether Dr. Pirooz breached the single non-compete and confidentiality provision which forms the basis for MEMC's breach of contract action. However, neither Missouri law nor the Severance Agreement provide any authority or power for deciding this case on the basis of some sense of equity or fairness.  Doing so exceeds the power granted to the arbitrator under the Severance Agreement and evidences a manifest disregard for Missouri law.

*United Inter-Mountain Telephone Company v. Communications Workers of America, Local 3871*, 662 F.Supp 82 (E.D. Tenn. 1987), involved an arbitration in which the arbitrator was to interpret the terms of a collective bargaining agreement as they related to a layoff by the employer, United Inter-Mountain Telephone Company.  The arbitrator found in favor of the employee and awarded a return of her former position prior to the layoff.  *United Inter-Mountain* at 83.

The reviewing District Court in *United Inter-Mountain* stated that when an arbitrator renders an award which is contrary to the express provisions of the contract, the Court may vacate the award.  *Id.* at 83.  Furthermore, an arbitrator's award will not be enforced if the

---

[4]  Neither the <u>Seebree</u> or <u>Hawkins</u> cases cited by the arbitrator involve a situation even remotely similar to the case at bar, but are general equity cases involving a forfeiture in the context of real estate transactions.

interpretations of the agreement between the parties has no rational basis in the agreement. *Id.* The arbitrator may not base his award on policies and preferences outside the contract. *Id.*

When analyzing the arbitration award that was under review, the Court found that although the arbitrator initially recognized that the employer possessed the general authority to layoff workers, he derived his award from a finding that the employer's layoff of the employee was not "reasonable." *Id.* at 84. The Court held that the arbitrator "did abandon the contract and did exceed his authority in rendering this award." *Id.* at 83. The Court vacated the award of the arbitrator. *Id.* at 85.

In *Roadway Package System, Inc. v. Kayser*, 257 F.3d 287 (3rd Cir. 2001), an arbitration was held over whether or not Roadway Package System, Inc.'s termination of Kayser was within the terms of a document entitled "Linehaul Contractor Operating Agreement." As in *United Inter-Mountain*, the arbitrator's award in *Kayser* began with the arbitrator acknowledging that his authority was set out in the agreement between the parties. *Kayser* at 301. The reviewing District Court and later the 3rd Circuit found that, despite the arbitrator's recognition of the agreement as controlling, the arbitrator proceeded, in the award, to frame the issue as one of wrongful or proper termination and rendered his decision according to said standard. *Id.* at 300.

The 3rd Circuit stated that the scope of the arbitrator's authority is defined and confined by the agreement to arbitrate. *Id.* The Court held that the arbitrator's conclusion, that there was a wrongful termination, was improper, given that the correct question should have been whether the agreement between the parties was violated. *Id.* at 301. Accordingly, the 3rd Circuit affirmed that holding of the District Court that the arbitration award be vacated. *Id.* at 301 - 302.

Similar to the facts of *United Inter-Mountain* and *Kayser*, the arbitrator in the present matter correctly stated that he was charged with determining whether a breach of contract had

19

occurred pursuant to the Severance Agreement. [Ex. 9; P. 2].  As in *United Inter-Mountain* and *Kayser*, the arbitrator rendered his decision based upon considerations which were outside of the contract requiring interpretation.  The only way in which the *United Inter-Mountain* and *Kayser* cases differ from our present matter is that in the present matter the arbitrator overtly stated that "(u)nder all the circumstances it would be unfair and inequitable to enforce this forfeiture," whereas the above referenced cases required the reviewing courts to infer a bit more from the language of the arbitration awards before holding that the arbitration awards should be vacated. The language of the arbitrator's decision in this case makes it crystal clear that the arbitrator simply decided that he was not going to enforce the Severance Agreement the parties had entered into.  The arbitrator had no power, under the Severance Agreement, to do so.

Putting aside the fact that the arbitrator had no power under the Severance Agreement to simply elect not to enforce what the parties agreed to, there is also no basis under Missouri law to apply equitable principles and elect not to "enforce" the forfeiture of benefits in the context of this breach of contract action.  In comments the arbitrator made near the beginning of the arbitrator's decision and at the end, the arbitrator unequivocally states that he will not "enforce" the forfeiture of benefits for Pirooz's breach of the non-compete/confidentiality obligations. Apparently, the arbitrator believed his role was to assess whether these non-compete/confidentiality obligations were enforceable under Missouri law.  For example, he discussed "materiality" of the competition between Soitec and MEMC and cited the *Victoria Secrets Stores* case in conjunction with weighing whether he should enforce the forfeiture of benefits agreed to by the parties.   The arbitrator disregarded Missouri law applicable to this forfeiture of benefits case at bar and incorrectly applied law applicable to cases seeking specific

20

performance of a non-compete provision or an injunction prohibiting an individual from working for a competitor.

In this case, the arbitrator recognized that MEMC was simply seeking return or forfeiture of the severance benefits paid to Pirooz and was not seeking to prohibit Pirooz from working for Soitec.  [Ex. 46; P. 3, 7 & 8].  As such, this case involves a "non-competition forfeiture clause."  A "non-competition forfeiture clause" is different than a situation where a party is seeking to keep a person from working, which might not be enforceable because it "may unreasonably restrain trade or endanger the employee's livelihood."  *Clark v. Lauren Youn Tire Ctr. Profit Sharing Trust*, 816 F.2d 480, 482 n.1 (9th Cir. 1987).  Courts have long drawn "a distinction between provisions that prevent an employee from working for a competitor and those that call for a forfeiture of certain benefits should he do so."  *Tatom v. Ameritech Corp*., 305 F.3d 737, 744 (7th Cir.1988) ("Forfeiture contracts leave the ex-employee free to make a living as he chooses."); *Cinelli v. American Home Prods*., 785 F.2d 264, 266 (2nd Cir.1986) (noting that forfeiture provisions merely work forfeiture of economic advantage and do not prevent post-termination employment); *Golden v. Kentie Floors, Inc*., 512 F.2d 838, 844 (5th Cir.1975) (forfeiture provision "is not a prohibition on the employee's engaging in competitive work" but instead provides consequence of choice to do so (quotation omitted)).  As demonstrated by the above authorities, the forfeiture provision sought to be enforced in this case does not invoke the equitable considerations which come into play when seeking to prevent a person from earning a livelihood, and is enforceable regardless of whether it is reasonable, fair, etc.[5]

---

[5]  Curiously, the arbitrator intimated that perhaps MEMC should have instead tried to prevent Pirooz from working for Soitec through the end of July 2004, instead of trying to enforce MEMC's breach of contract forfeiture claim. [Ex. 46; p. 7 & 8]

Missouri law recognizes the above distinction between a case involving enforcement of a forfeiture of benefits versus a case involving enforcing the non-compete provision itself. *Grebing v. First National Bank of Cape Girardeau*, 613 S.W.2d 872 (Mo.App. 1981).  In *Grebing*, the plaintiff, a bank officer, went to work for a competitor bank which triggered a forfeiture of pension benefits provision.  *Id*. at 874.   The plaintiff asserted that the forfeiture provision was the same as a covenant not to compete and thus was subject to scrutiny by the court as to whether it was reasonable and enforceable.  *Id*.  The *Grebing* court recognized that the situation was different than a situation in which a party was seeking to enforce a covenant not to compete.

> "Rather, we have a penalty, a forfeiture of benefits, imposed on the employee if he does compete after termination of employment.  Thus, we must first determine whether this distinction removes the forfeiture provision from the restraint of trade category and, so eliminates the need to determine whether the provision is reasonable."  *Id*.

The Court held that under Missouri law, a forfeiture of benefits provision "is not a restraint of trade and is valid and enforceable."  *Id*. at 876.

There is no question that this case simply involved a forfeiture of benefits claim. Missouri law does not require a determination of whether the forfeiture of benefits is fair, reasonable and enforceable.  As such, the arbitrator misunderstood and disregarded Missouri law in determining that the forfeiture provision was unenforceable.

In summary, the arbitrator in this case rendered his award in this matter based upon equitable and fairness grounds, rather than a simple determination as to whether Dr. Pirooz breached the Severance Agreement.  Under these circumstances, the award should be vacated because the arbitrator's decision exceeded the authority granted to him in the Severance

22

Agreement and because the use of equitable principles in this contract case seeking only forfeiture of the benefits constitutes a manifest disregard of applicable Missouri law.

B. Failure To Enforce Severance Agreement Despite Finding Of Competition In SOI Market.

The Severance Agreement prohibits Pirooz from "engaging in or contributing his knowledge to any work or activity that involves a product, process, apparatus, service or development which is then *competitive with* or similar to a product, process, apparatus, service or development on which [Pirooz] worked or with respect to which [Pirooz] had access to Confidential Information while at MEMC . . ." {emphasis added} [Ex. 6; P. 2].  Therefore, in order to determine whether Dr. Pirooz breached this provision by going to work for Soitec, the arbitrator had to determine whether Soitec manufactured or sold a product which was "competitive with or similar to" a product of MEMC.

The arbitrator recognized that both companies sold silicon wafers.  Nonetheless, the arbitrator focused on the distinctions between EPI silicon wafers and SOI silicon wafers.  Soitec mainly sold SOI silicon wafers, whereas the majority of MEMC's sales were EPI and polished silicon wafers (in addition to SOI wafers).  On this basis, even after specifically finding that MEMC had sold SOI wafers into this growing market, the arbitrator apparently determined that Soitec did not manufacture and sell a product that was "competitive with or similar to" an MEMC product, even though certain customers had replaced EPI wafers with SOI wafers, and in spite of the extensive and undisputed evidence that MEMC had entered the SOI market prior to Pirooz's termination and that MEMC had been selling SOI wafers since 2001.  [Ex. 46; P. 7]

Specifically, on April 1, 2001 MEMC entered into a relationship with Ibis Technology Corporation (hereinafter "Ibis") for the production and sale of SOI wafers. [Ex. 18].  Pursuant to

the agreements between MEMC and Ibis, MEMC provided the materials and technical

specifications for SOI wafers and actually sold the SOI wafers to customers. [Ex. 18].  MEMC

also produced evidence of the income it generated via MEMC's sales of SOI wafers between

2001 and 2004. [Ex. 19].

 MEMC also produced evidence at the arbitration that Pirooz had participated in work on

MEMC's plan to expand its position in the SOI market.  MEMC submitted reports authored by

Pirooz while employed by MEMC that were dated from February 2002 to June 2002 entitled

"Technology Monthly Report," "Materials Research & Characterization Executive Summary,"

and "Materials Research and Characterization - Monthly Highlights." [Ex. 26 - 37].  In these

documents Pirooz discusses SOI technology and the silicon wafer market's demand for SOI

wafers. [Ex. 26 - 37].

 MEMC submitted a document authored by Pirooz entitled "MEMC: Soitec – Bernin" in

which a joint venture between MEMC and Soitec, or possible buyout of Soitec by MEMC, was

discussed. [Ex. 24].  MEMC submitted various emails between Pirooz and MEMC employees,

dated during the time in which Pirooz was employed by MEMC, in which Pirooz discussed or

was privy to conversations about MEMC expanding its place in the SOI wafer market. [Ex. 20 -

23].  MEMC even submitted a document written by Pirooz entitled "MEMC: SOI Business Plan"

dated July 2002 in which Pirooz reported to the other executives of MEMC on the topic of

MEMC's options for further expansion into the SOI wafer market.

 The evidence produced by MEMC at the time of the arbitration constituted conclusive

and undisputed evidence that MEMC participated in the manufacture and sale of SOI wafers.

More importantly, in his decision the arbitrator even acknowledged that MEMC participated in

the manufacture and sale of SOI wafers from 2001 through 2004. [Ex. 46; P. 7].  Specifically, the

decision says: "MEMC's agency agreement with Ibis had produced immaterial royalties over several years of less than one-half million dollars for sales of Ibis SOI product." [Ex. 46; p. 7] Despite acknowledging such SOI sales by MEMC in the text of the decision, the arbitrator nonetheless found that:

> "(d)uring the two year period ending July 30 (or 31), 2004, there was no evidence that MEMC was in competition (and certainly not material competition) for the sale of SOI wafers. MEMC had no SOI wafers qualified for sale to its or SOI's customers. For this additional reason, Dr. Pirooz did not breach his MEMC contract by his work for Soitec from November 1, 2003 to the end of July 2004." [Ex. 46; P. 6]

An arbitrator has no discretion to ignore the plain language of an agreement between the parties and instead follow his own whims and biases. *Freightliner v. Teamsters Local 305*, 336 F.Supp.2d 1118, 1122 (Dist. Oreg. 2004). When the arbitrator's own words manifest an infidelity to his obligation under the agreement between the parties, the courts have no choice but to refuse enforcement of the award. *United Steel Workers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597 (U.S. 1960).

In this case, Pirooz was in breach of his obligations under the Severance Agreement if Soitec sold a product during the requisite time period which was "competitive with or similar to" an MEMC product. The provision does not say that it has to be an important product, that the product has to make up some significant portion of overall sales or that the competition with or similarity to the product has to be material. Remember, the parties expressly agreed that <u>any</u> breach of the non-compete provision was a "material" breach of the Severance Agreement. The arbitrator expressly found that <u>both</u> parties sold SOI wafers and, as such, Soitec was selling a product both "competitive with" and "similar to" an MEMC product.

It is apparent from the language of his award that the arbitrator ignored his own findings that MEMC had indeed produced and sold SOI wafers from 2001 through 2004, and, thus,

competed in the SOI wafer market, by concluding that MEMC and Soitec did not compete.
Thus, the arbitrator's conclusion is "completely irrational" and constitutes a manifest disregard
of basic Missouri law of contract interpretation.  The parties granted the arbitrator the limited
power of interpreting and enforcing the Severance Agreement.  Ignoring the plain language of
the Severance Agreement and failing to enforce Pirooz's obligation under the Severance
Agreement goes beyond the powers granted to the arbitrator by the parties such that the award
should be vacated.

     C.   Failure To Address and Enforce "Similar To" Limitation.

     9 U.S.C. §10(4) permits the court to vacate an arbitration award where the arbitrator "so
imperfectly executed [his powers] that a mutual, final, and definite award upon the subject
matter submitted was not made."  The courts interpret "mutual" and "final" to mean that the
arbitrator must have resolved the entire dispute that was submitted to him.  *IDS Life Insurance
Co. v. Royal Alliance Associates, Inc.*, 266 F.3d 645, 650 (7th Cir. 2001).  The question for the
court to determine is whether the arbitration award, in terms of judgment, order or bottom line, is
incomplete in the sense of having left unresolved some portion of the parties' dispute. *Id.* at 651.

     The text of the Confidentiality Agreement signed by Pirooz prohibited him from
"engaging in or contributing his knowledge to any work or activity that involves a product,
process, apparatus, service or development which is then competitive with *or similar to* a
product, process, apparatus, service or development on which [Pirooz] worked or with respect to
which [Pirooz] had access to Confidential Information while at MEMC . . ." {emphasis added}
[Ex. 6; P. 2].  The arbitrator found that MEMC failed to prove that it had a "product, process,
apparatus, service or development that was 'then competitive with or similar to a product' sold
by Soitec," quoting the wording of the Confidentiality Agreement. [Ex. 44; P. 5].  However, the

arbitrator's explanation of his findings leads only to the conclusion that the arbitrator considered only whether MEMC had a product that was "then competitive with" a product of Soitec, and did not consider whether MEMC's products (silicon wafers) were "similar to" Soitec's products (silicon wafers).

The arbitrator wrote that he found no evidence that MEMC was "in competition" for the sale of SOI wafers during the two year period ending July 30, 2004, even though he, in fact, had also found just such evidence by finding that MEMC had produced sales of SOI wafers through MEMC's agreements with Ibis. [Ex. 46; p. 6]. He further stated that Pirooz presented evidence from Dr. John DeLuca that MEMC was not a "principal competitor" of Soitec and that Pirooz was "not going to a competitor." [Ex. 46; P. 6]. He referred to the fact that he not only found that there was not proof that Soitec and MEMC were "in competition," but that there was also no evidence that they were in "material competition." [Ex. 46; P. 6].

Nowhere in the arbitrator's explanation of his conclusions does the arbitrator address the issue of whether MEMC's products are "similar to" Soitec's products. A careful review of the decision demonstrates that the arbitrator did not consider whether Soitec and MEMC had products which were "similar to" each other.

Notwithstanding the fact that the decision does not directly discuss whether Soitec and MEMC had similar products, as referenced above the arbitrator recognized that Soitec and MEMC both sold SOI wafers. Therefore, the companies actually sold identical (not just similar) products.

Further, the fact that MEMC's EPI wafers were in "competition with or similar to" Soitec's SOI wafers is not legitimately disputed by the parties. During the hearing, undisputed testimony was introduced that Soitec wafers have replaced MEMC wafers at certain customers,

27

including AMD, Freescale and IBM.  It is the very essence of a competitive or similar product

that a second product replacing the first product sold to a customer is competitive with the

replaced product.  Because the arbitrator did not make a finding regarding (or even considering)

the "similar to" language in the Confidentiality Agreement, the arbitrator did not resolve the

entire dispute that was submitted to him.  As a result, a mutual, final and definite award on the

subject matter submitted was not made due to the arbitrator's failure to fully and completely

interpret and enforce the Severance Agreement.

> D. <u>Award of Attorneys' Fees Constitutes Manifest Disregard Of Law And Exceeds
>    Powers Granted By Severance Agreement.</u>

The arbitrator awarded attorneys' fees in the amount of $106,832.69 to Pirooz. [Ex. 46;

P. 10 - 11].  The arbitrator's decision does not directly explain the basis for the attorney fee

award, but did cite two provisions in the Severance Agreement which discuss attorneys' fees.

[Ex. 46; P. 9].  The arbitrator first cited paragraph 13 of the Severance Agreement which states

in relevant part that "(t)he arbitrator shall have the authority to award costs of the Arbitration

(including attorney's fees) in a manner consistent with the controlling substantive claim at

issue." [Ex. 46; P. 9 & Ex. 9; P. 6].  He also cited paragraph 17 of the Severance Agreement

which states:

> "If it is finally determined by a court or arbitrator that either party has violated any of the
> promises contained in this Agreement, then such party shall reimburse the other party for all
> reasonable costs incurred by the other party, including reasonable attorney's fees, in
> enforcing or defending its rights under the Agreement." [Ex. 46; P. 9 & Ex. 9; P. 6]

Paragraph 17, by its express terms, is only triggered "if it is finally determined by a court

or arbitrator that either" Pirooz or MEMC "has violated any promises contained in the"

Severance Agreement.  In this case, there was no finding that either MEMC or Pirooz violated

any obligations under the Severance Agreement.  In fact, there was not even a claim or

counterclaim by Pirooz even alleging a violation by MEMC of any provision of the Severance

Agreement. [Ex. 41 & 43].  Pirooz received his entire severance package of over $300,000.00,

and MEMC certainly satisfied all of its promises contained in the Severance Agreement, in order

to ensure for itself that MEMC confidential information or technical know-how would not wind

up in the hands of its competition.  Moreover, there was no finding in the arbitration award that

either party breached the Severance Agreement.  [Ex. 46].  As such, paragraph 17 was never

triggered and provides no basis for an award of attorneys' fees.

Paragraph 13 of the Severance Agreement permits the arbitrator to award costs, including

attorney fees, if doing so would be in "a manner consistent with the controlling substantive claim

at issue." [Ex. 9; P. 6].  This means that if "the controlling substantive claim at issue" is a claim

which entitles a party to attorneys' fees under Missouri law, the arbitrator is empowered to

award

attorneys' fees.[6]  Thus, the subject matter of "the controlling substantive claim" must be

evaluated in conjunction with Missouri law to determine whether there is a basis for an award of

attorneys' fees under paragraph 13.

As a general rule in Missouri, attorneys fees are not awarded as a matter of right to the

successful party.  *Harris v. Union Electric Company*, 766 S.W.2d 80, 89 (Mo. 1989).  Recovery

of attorneys fees is permitted only when provided for by contract, by statute, when the wronged

party was forced into collateral litigation, or when a court of equity finds them necessary in order

to balance benefits.  *Osterberger v. Hites Construction Co.*, 599 S.W.2d 221, 230 (Mo. App.

E.D. 1980).

---

[6]  Paragraph 16 of the Severance Agreement has a Missouri choice of law and thus Missouri law must be consulted in order to assess what substantive claims entitle a party to attorneys' fees.

There is no dispute that the only "substantive claim" in this case is a breach of contract claim. Under Missouri law, a party is entitled to attorneys' fees in a breach of contract claim only if the contract clearly provides for them. *Soto v. Midstates Millwork, Inc.*, 786 S.W.2d 229, 232 (Mo.App 1990). Where the claim for attorneys fees is based upon contract, the court must adhere to the terms of the contract and not go beyond it. *Harris* at 89. The contract at issue in this case is the Severance Agreement and it provides for an award of attorneys' fees only under the limited circumstances set forth in paragraph 17. As discussed above, paragraph 17 is not triggered in this case and thus does not provide a basis for an award of attorneys' fees to MEMC by the arbitrator. There is no other provision in the Severance Agreement (or any of the other agreements it incorporates) which provides a basis for an award of attorneys' fees and, as such, an attorney fee award to Pirooz is not available under Missouri law in this breach of contract action.

By awarding attorneys' fees, the arbitrator exceeded the powers granted to him by the parties in the Severance Agreement. Moreover, by first identifying the applicable governing authority (paragraphs 13 and 17 of the Severance Agreement), and then proceeding to ignore said authority by awarding attorneys' fees contrary to the terms of these paragraphs, the arbitrator manifestly disregarded applicable law. Therefore, the award of attorneys' fees to Pirooz must be vacated.

V.  <u>CONCLUSION</u>

For all the foregoing reasons, the arbitrator's award should be vacated and a new arbitration ordered where the entire dispute can be submitted to and determined, in full, by a new arbitrator.  The Court should direct the new arbitrator to only address whether Dr. Pirooz breached his obligations under the Severance Agreement in accordance with Missouri contract law principles.  In vacating the award, the Court should further direct that Dr. Pirooz is not entitled to an award of attorneys' fees under the Severance Agreement.

31

Dated: _____          SAUTER SULLIVAN, LLC


                                  By: /s/ Christopher K. Geldmacher_____
                                      Kevin A. Sullivan, EDMo. #27523
                                      Christopher K. Geldmacher, EDMo. #511688
                                      3415 Hampton Avenue
                                      St. Louis, MO  63139
                                      Telephone:  (314) 781-3222
                                      Fax:  (314) 781-2726
                                      ksullivan@sselaw.net
                                      cgeldmacher@sselaw.net




                          Certificate of Service

        The undersigned hereby certifies that a copy of the foregoing Defendant MEMC
Electronic Materials, Inc.'s Memorandum in Support of Motion to Vacate Arbitration Award
was served on counsel of record via first class U.S. Mail on this 7th day of October, 2005.

Michael B. Kass
Armstrong Teasdale, LLP
One Metropolitan Square, Suite 2600
St. Louis, MO 63102-2740

                                          /s/ Christopher K. Geldmacher